**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. ______________**

| | |
|---|---|
| LORRIE SIERRA, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>COLORADO REHABILITATION AND OCCUPATIONAL MEDICINE, PLLC,<br><br>*Defendant*. | JURY TRIAL DEMANDED |

**PLAINTIFF'S CLASS ACTION COMPLAINT**

Plaintiff Lorrie Sierra ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Colorado Rehabilitation and Occupational Medicine, PLLC ("Defendant" or "CROM") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") from unauthorized access and disclosure.

2. Public reporting indicates that, on or about July 2, 2026, the ransomware group "INC Ransom" claimed responsibility for a cyberattack involving Colorado Rehabilitation and Occupational Medicine.[1]

3. Defendant is a Colorado healthcare provider that describes itself as "Colorado's leading medical group for non-surgical joint and muscle pain treatments."[2]

4. Because Defendant has not yet publicly disclosed the full nature and scope of the incident, the precise categories of information impacted are not yet confirmed. However, based on Defendant's healthcare operations and public-facing patient forms and payment portal, the Private Information maintained by Defendant may include names, dates of birth, contact information, medical records, treatment information, insurance information, payment-related information, and other sensitive personal and protected health information.

5. There has been no assurance offered by Defendant that all personal data or copies of data potentially accessed or acquired by unauthorized actors have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar incident in the future.

6. Plaintiff and Class Members have suffered and remain at risk of suffering ascertainable losses in the form of loss of privacy, time spent responding to the Data Breach, increased risk of identity theft and medical identity theft, and out-of-pocket expenses incurred or likely to be incurred to mitigate the effects of the Data Breach.

---

[1] *See* Colorado Rehabilitation and Occupational Medicine Data Breach, BREACHSENSE, *https://www.breachsense.com/breaches/colorado-rehabilitation-and-occupational-medicine-data-breach/* (last accessed July 21, 2026); *See*, *Incransom Strikes Colorado Rehabilitation and Occupational Medicine*, DEXPOSE https://www.dexpose.io/incransom-strikes-colorado-rehabilitation-and-occupational-medicine/ (last accessed July 21, 2026).

[2] *See* COLORADO REHABILITATION & OCCUPATIONAL MEDICINE, *Home Page*, https://coloradorehabilitation.com/ (last accessed July 21, 2026).

7. Plaintiff brings this class action lawsuit to address Defendant's inadequate safeguarding of Private Information that it collected and maintained in connection with its healthcare operations.

8. The risk of unauthorized disclosure and misuse of Plaintiff's and Class Members' Private Information was known or reasonably foreseeable to Defendant, particularly because healthcare providers collect and store highly sensitive PII and PHI.

9. Upon information and belief, Defendant failed to properly implement, monitor, and maintain adequate data security practices for the systems that housed Plaintiff's and Class Members' Private Information.

10. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed, acquired, disclosed, or otherwise compromised, or placed at risk, in connection with the Data Breach.

## II. <u>PARTIES</u>

11. Plaintiff Lorrie Sierra is a natural person and resident citizen of Littleton, Colorado, where she intends to remain.

12. Defendant Colorado Rehabilitation and Occupational Medicine, PLLC, is a Colorado-based healthcare provider.

13. Defendant's website lists CROM office locations in Greenwood Village, Denver, Colorado Springs, and Denver's Rose Medical Campus. [3]

## III. <u>JURISDICTION AND VENUE</u>

14. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which the proposed

[3] *See Contact Page*, CROM https://coloradorehabilitation.com/contact/ (last accessed July 21, 2026).

Class contains more than 100 members, at least one member of the proposed Class is a citizen of a state different from Defendant, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over Defendant because Defendant is a Colorado healthcare provider that conducts substantial business in Colorado, maintains offices in Colorado, collects and maintains Private Information from Colorado residents, and the claims asserted in this action arise from Defendant's Colorado-based conduct and omissions.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District for venue purposes, maintains its principal executive offices in this District, conducts substantial business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### *A. Defendant's Business and Collection of Plaintiff's and Class Members' Private Information*

17. CROM is a Colorado healthcare provider specializing in non-surgical joint and muscle pain treatment. Defendant describes itself as Denver's physiatry practice and states that it treats orthopedic and neurological conditions, sports injuries, work injuries, and age-related joint and muscular conditions.[4]

18. CROM's website lists services and conditions including spinal procedures, auto accident injury care, on-the-job injury treatment, sports injury treatment, back pain, rotator cuff tear, osteoarthritis, tendinitis, knee problems, and post-traumatic brain injury.[5]

[4] *Supra* Note 3.
[5] *Id*.

19. As a condition of receiving healthcare services, Plaintiff and Class Members entrusted Defendant with sensitive Private Information.

20. CROM's new-patient packet includes patient consent forms and authorizations reflecting that CROM collects and uses medical records and health information for treatment, payment, and healthcare operations.[6]

21. CROM's new-patient packet further includes an authorization for CROM to obtain a patient's complete medical records for medical evaluation and treatment.[7]

22. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed duties to maintain the confidentiality and security of that information and to protect it from unauthorized access, acquisition, disclosure, and misuse.

23. Plaintiff and Class Members reasonably relied on Defendant to keep their Private Information confidential and securely maintained, and to disclose it only for authorized purposes.

***B. The Data Breach***

24. Public reporting indicates that, on or about July 2, 2026, INC Ransom claimed responsibility for a cyberattack involving Defendant.[8]

25. Reporting also states that INC Ransom claimed: "The full leak will be published soon, unless a company representative contacts us via the channels provided."[9]

---

[6] *See New Patient Packet,* CROM, https://coloradorehabilitation.com/wp-content/uploads/2023/06/CROM-New-Patient-Packet.pdf (last accessed July 21, 2026).
[7] *Id*.
[8] *Supra* note 1.
[9] *See*, *Incransom Strikes Colorado Rehabilitation and Occupational Medicine*, DEXPOSE https://www.dexpose.io/incransom-strikes-colorado-rehabilitation-and-occupational-medicine/ (last accessed July 21, 2026).

26. INC Ransom is described as a ransomware operation that uses double-extortion tactics, including data exfiltration followed by threats to publish stolen data on a leak site if the victim does not pay.[10]

27. Upon information and belief, the Data Breach involved unauthorized access to, acquisition of, disclosure of, or threat to disclose Private Information maintained by Defendant.

28. Because Defendant has not publicly disclosed the full nature and scope of the Data Breach, the exact categories of impacted information are not yet confirmed. However, based on Defendant's healthcare operations and public patient-facing materials, the information potentially impacted may include names, dates of birth, contact information, medical records, treatment information, insurance information, payment-related information, and other PII and PHI maintained by Defendant.

29. Defendant had obligations created by law, industry standards, common law, and its relationship with Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

30. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would use reasonable measures to keep such information confidential and secure from unauthorized access and would provide timely notice of any data security incident requiring notice.

31. Defendant's data security obligations were particularly important given the sensitive nature of the PII and PHI maintained by healthcare providers and the substantial increase in cyberattacks targeting healthcare entities in recent years.

---

[10] *See*, Colorado Rehabilitation & Occupational Medicine Claimed by IncRansom, GALAXYWARDEN, https://www.galaxywarden.com/blog/breach/colorado-rehabilitation-incransom-july-2026 (last accessed July 21, 2026).

32. Defendant knew or should have known that its electronic records and systems would be targeted by cybercriminals.

### *C. The Healthcare Sector is Particularly Susceptible to Data Breaches*

33. Defendant was on notice that companies in the healthcare industry are susceptible targets for data breaches.

34. In August 2014, after a cyberattack on Community Health Systems, Inc., the Federal Bureau of Investigation ("FBI") warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[11]

35. The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[12] In 2022, the largest growth in compromises occurred in the healthcare sector.[13]

36. Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims

---

[11] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited: June 25, 2026).

[12] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2019/01/ITRC_2018-EOY-BREACH-REPORT-KEY-FINDINGS.pdf (last visited: June 25, 2026).

[13] Identity Theft Resource Center, *2022 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited: June 25, 2026).

were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[14]

37. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[15]

38. Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[16]

39. As a healthcare provider, Defendant knew, or should have known, the importance of safeguarding its patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on Defendant's patients as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[14] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited: June 25, 2026).

[15] *Id*.

[16] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited: June 25, 2026).

### *D. Defendant Failed to Comply With HIPAA*

40. Defendant's Data Breach resulted from a combination of insufficiencies that indicate Defendant failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Defendant's Data Breach that Defendant either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

41. Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

42. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

43. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

44. Plaintiff's and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

45. Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

46. Based upon publicly available information regarding the Data Breach, Plaintiff's and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

47. Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

48. Upon information and belief, Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

49. Upon information and belief, Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

50. Upon information and belief, Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

51. Upon information and belief, Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

52. It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

53. It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered

unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

54. Given the occurrence of the Data Breach and impact such has had on victims' Private Information, it is reasonable for these victims, including Plaintiff and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

55. In addition, Defendant's Data Breach could have been prevented if Defendant had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

56. Defendant's security failures also include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendant creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(4); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

57. Because Defendant has failed to comply with HIPAA, while monetary relief may cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure Defendant's approach to information security is adequate and appropriate going forward. Defendant still maintains the PHI and other highly sensitive PII of its current and former patients, including Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

### *E. Defendant Failed to Comply with FTC Guidelines*

58. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

59. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[17] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

60. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for

---

[17] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (October 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited: May 8, 2026).

suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

61. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

62. Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like Defendant here. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

63. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect Private Information they collect and maintain from consumers. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

64. The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The

larger the data set, the greater potential for analysis and profit."[18]

65. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

66. Defendant was at all times fully aware of its obligation to protect the Private Information of its patients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *F. Defendant Failed to Comply with Industry Standards*

67. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

68. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security,

---

[18] FTC Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), *transcript available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited: June 25, 2026).

Incident Response Management, and Penetration Testing.[19]

69. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

70. Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network

[19] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited: June 25, 2026).

behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[20]

71. Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

### *G. Defendant Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information*

72. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry

[20] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited: June 25, 2026).

standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

73. Upon information and belief, Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise grossly negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to sufficiently train its employees regarding the proper handling of its patients' Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA; and

f. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

74. Upon information and belief, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

75. Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in

the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

76. Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendant.

### ***H. Plaintiff and Class Members are at a Significantly Increased and Substantial Risk of Fraud and Identity Theft as a Result of the Data Breach.***

77. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[21] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

78. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

---

[21] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited: June 25, 2026).

79. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

80. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

81. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

82. One such example of how malicious actors may compile Private Information is through the development of "Fullz" packages.

83. Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble

complete dossiers on individuals. These dossiers are known as “Fullz” packages.

84. The development of “Fullz” packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff’s and the proposed Class’s phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members’ stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

85. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim’s identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[22] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft’s long-lasting negative impacts.

86. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver’s license or official identification card in the victim’s name but with the thief’s

[22] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited: June 25, 2026).

picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

87. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[23] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

- 77-percent experienced financial-related problems;
- 29-percent experienced financial losses exceeding $10,000;
- 40-percent were unable to pay bills;
- 28-percent were turned down for credit or loans;
- 37-percent became indebted;
- 87-percent experienced feelings of anxiety;
- 67-percent experienced difficulty sleeping; and
- 51-percent suffered from panic or anxiety attacks.[24]

88. The ramifications of Defendant's failure to keep its patients' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

89. The Private Information stolen in the Data Breach are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

---

[23] *2023 Consumer Impact Report* (Jan. 2024), IDENTITY THEFT RESOURCE CENTER, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf (last visited: June 25, 2026).

[24] *Id*. at pp 21-25.

90. As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

### *I. Plaintiff's and Class Members' Damages*

*Plaintiff Lorrie Sierra's Experience*

91. Plaintiff is a former patient of Defendant.

92. Plaintiff started receiving medical treatment from Defendant in 2025.

93. When Plaintiff became a patient, Defendant required Plaintiff to provide it with substantial amounts of her Private Information.

94. Upon information and belief, Plaintiff's Private Information was subject to the Data Breach.

95. Plaintiff would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal information from theft, and that those systems were subject to a data breach.

96. Upon information and belief, Plaintiff suffered actual injury in the form of having her Private Information compromised and stolen as a result of the Data Breach.

97. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her personal and health information – a form of intangible property that Plaintiff entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

98. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

99. Just a few weeks prior to the filing of this Complaint, Plaintiff noticed multiple fraudulent charges on her bank account debit card and was forced to contact her bank and change her card number to avoid future fraud risk.

100. Plaintiff has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, as Defendant's systems have already been shown to be susceptible to compromise and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' Private Information.

101. As a result of the Data Breach, Plaintiff has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff is very concerned and frustrated about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

102. Plaintiff also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of her privacy rights; (c) present, imminent, and impending injury arising from the

increased risk of identity theft, and fraud; and (d) the time and effort spent trying to combat the downstream effects of the breach.

103. Upon information and belief, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

104. Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

105. Upon information and belief, Plaintiff's and Class Members' Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

106. As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

107. Plaintiff and Class Members may incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

108. Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

109. The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed

mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

110. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendant. Plaintiff and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiff and Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of Defendant's system and protect Plaintiff's and Class Members' Private Information. Thus, Plaintiff and the Class did not receive the benefit of the bargain.

111. Upon information and belief, Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[25] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[26]

112. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by

---

[25] *See How Data Brokers Profit from the Data We Create*, THE QUANTUM RECORD, https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/ (last visited: April 14, 2026).

[26] *Frequently Asked Questions,* NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited: April 14, 2026).

Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

113. Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

114. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendant, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal information of its patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

115. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V. <u>CLASS ACTION ALLEGATIONS</u>

116. Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23.

117. Specifically, Plaintiff proposes the following Class, subject to amendment as appropriate:

> All individuals whose Private Information was impacted as a result of the Data Breach (the "Class").

118. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal

representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

119. Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

120. <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of hundreds of individuals, including current and former patients of Defendant, whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

121. <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant's conduct violated the FTCA;

c. When Defendant learned of the Data Breach;

d. Whether Defendant's response to the Data Breach was adequate;

e. Whether Defendant unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

j. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data Breach;

l. Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

o. What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

p. Whether Defendant's conduct was grossly negligent;

q. Whether Defendant's conduct was *per se* negligent;

r. Whether Defendant was unjustly enriched;

s. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

t. Whether Plaintiff and Class Members are entitled to credit or identity monitoring and monetary relief; and

u. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

122. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

123. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

124. Predominance. Plaintiff's and Class Members' Private Information was maintained by Defendant and compromised through the same Data Breach and the same alleged course of inadequate data-security practices. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

125. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

126. Finally, all members of the proposed Class are readily ascertainable. Defendant should be able to ascertain the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## VI. CLAIMS FOR RELIEF

### COUNT I
### GROSS NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

127. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

128. Defendant required Plaintiff and Class Members to submit non-public personal information to obtain services from it.

129. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its

security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

130. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

131. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class, which is recognized by laws and regulations including but not limited to the Federal Trade Commission Act, as well as common law. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

132. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

133. Defendant further had a duty to use reasonable care in protecting confidential data because Defendant is bound by industry standards to protect confidential Private Information.

134. Defendant breached those duties through grossly negligent and reckless conduct, consciously disregarding known cybersecurity risks and the foreseeable, catastrophic harm to Plaintiff and Class Members. Defendant's conduct was not mere inadvertence — Defendant had actual or constructive knowledge of the substantial risk of cyberattack facing entities like itself, was subject to applicable security requirements and industry standards, and was aware that basic,

industry-standard safeguards were readily available yet failed to implement them. The specific grossly negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its systems had reasonable data security safeguards in place;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised; and

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

135. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

136. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

137. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

138. Defendant's grossly negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

139. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

140. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

141. Pursuant to Section 5 of the FTCA, Defendant had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

142. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

143. Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

144. Upon information and belief, Defendant breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

145. Specifically, Defendant breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

146. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendant's duty in this regard.

147. Upon information and belief, Defendant also violated the FTCA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

148. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendant's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

149. Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA were intended to protect, and Defendant's failure to comply with those duties constitutes negligence per se.

150. Upon information and belief, Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Defendant's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

151. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the actual misuse of their Private Information and effort to mitigate the actual and potential impact of the Data Breach on their lives.

152. Upon information and belief, as a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

153. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (ON BEHALF OF PLAINTIFF AND THE CLASS)

154. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

155. Defendant provides services to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for services and/or entrusting their valuable Private Information to Defendant in exchange for such services.

156. Through Defendant's sale of services to Plaintiff and Class Members, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

157. As consideration, Plaintiff and Class Members paid money to Defendant and/or turned over valuable Private Information to Defendant. Accordingly, Plaintiff and Class Members bargained with Defendant to securely maintain and store their Private Information.

158. Defendant accepted payment and/or possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

159. In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard the Private Information as part of those services.

160. Defendant's implied promises to Plaintiff and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

161. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

162. Had Defendant disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to Defendant.

163. As a provider of services, Defendant recognized (or should have recognized) that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

164. Upon information and belief, Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

165. A meeting of the minds occurred, as Plaintiff and Class Members agreed, *inter alia*, to provide payment and/or accurate and complete Private Information to Defendant in exchange for Defendant's agreement to, *inter alia*, provide services that included protection of their highly sensitive Private Information.

166. Upon information and belief, Plaintiff and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

167. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

168. This Count is pleaded in the alternative to Count III above.

169. Plaintiff and Class Members conferred a benefit on Defendant by turning over their Private Information to Defendant and by paying for services that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

170. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff and Class Members.

171. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

172. Defendant has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

173. Upon information and belief, Defendant knew that Plaintiff and Class Members conferred a benefit upon it, which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

174. If Plaintiff and Class Members had known that Defendant had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

175. Due to Defendant's conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendant to be permitted to retain the benefit of its wrongful conduct.

176. Upon information and belief, as a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise,

publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

177. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

178. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**INVASION OF PRIVACY—INTRUSION UPON SECLUSION AND PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

179. Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

180. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

181. Defendant owed a duty to Plaintiff and the Class to keep this information confidential.

182. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' Private Information is highly offensive to a reasonable person.

183. The intrusion – the Data Breach - was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

184. Defendant's conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals, individuals in a special relationship with Plaintiff and the proposed Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiff and the proposed Class.

185. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

186. Defendant acted with recklessness when it permitted the Data Breach because it knew its information security practices were inadequate.

187. Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, materially impairing their mitigation efforts.

188. By intentionally failing to keep Plaintiff's and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

189. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

190. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

191. Intentionally causing anguish or suffering to Plaintiff and Class Members.

192. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

193. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff's privacy.

194. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

195. As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

196. And, on information and belief, Plaintiff's Private Information has already been published, or will be published imminently, by cybercriminals on the Dark Web.

197. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant with their inadequate cybersecurity system and policies.

198. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiff and the Class.

199. In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendant to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendant to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all triable issues.

DATED: July 21, 2026

Respectfully submitted,

*/s/ Grayson Wells*

Grayson Wells
Darrius D. Dixon
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203

(615) 254-8801
gwells@stranchlaw.com
ddixon@stranchlaw.com

***Counsel for Plaintiff and the Proposed Class***